*Rountree & Fogle* for appellants; *Shuck* for appellee.

<em>Banton<br>vs<br>Campbell's h's.</em>

---

## Banton *vs* Campbell's Heirs &c.

### Error to the Madison Circuit.

*Husband and Wife. Writs of Error. Limitations. Distribution.*

Chief Justice Marshall delivered the opinion of the Court.

In 1823, John and Elizabeth Banton filed their bill, in right of the latter, to have a settlement, distribution and division of the estates, consisting of land, slaves and personalty of Samuel and Mary Campbell, the parents

Chancery.<br><br>Case 132.<br><br><em>September 29.</em><br><br>Case stated in the bill.

of Mrs. Banton. The bill alleges, that the said Samuel and Mary held a tract of land, by joint conveyance made to them during coverture, on the equitable right of said Mary, that they had conveyed portions of it to their two sons, Samuel and William, as advancements, and on condition that they were to have no further part of the estate until the other children, eight in number, should be made equal to them; that Samuel Campbell, the ancestor, died intestate, possessed of slaves and personalty, and leaving his wife, Mary, the survivor, and that she had, before her death, made her will, devising to her sons, John, William, James, Anderson and Caldwell, portions of said land, on condition that they should relinquish all further claim on the estate of herself and their father, until the other heirs were made equal. The bill seeks to enforce the alleged condition of the conveyances and devises above mentioned, calls upon the six sons to elect whether they will bring the land into hotchpot, and whether they hold under the will of their mother, and prays for a sale of the slaves of their father, Samuel Campbell, and distribution of the proceeds, and for settlement and distribution of the personalty of both estates.

All the children of Samuel and Mary Campbell, (being nine besides the complainant,) answered the bill. *The answer of the defendants.* Samuel and William denied the alleged condition of the conveyances to them, refused to bring into hotchpot, the land so conveyed, and claimed an equal share of the slaves of their father, and of the personalty of both estates; and William, to whom about seven acres of land had been devised by his mother's will, on the condition above noticed, disclaimed that provision. The other defendants intimate some doubt as to the sufficiency of the deeds to Samuel and William to pass the title of their mother, and referring this question to the Court, insist upon the condition on which they were made, as alleged in the bill. These defendants all express a willingness to abide by the will of their mother, or in case that should be set aside, they ask for an equal and just division, &c. The answer of one of these defendants was made a cross bill against the co-defendants, Wil-

liam and Samuel alone, and upon the single question as to the condition or understanding on which the conveyances to them were made, as alleged in the original bill. The denials of the answers are positive.

In September, 1823, by consent of parties, commissioners were appointed to make sale of the slaves, and to make settlement with the administrators.

In March, 1824, by consent, it was decreed that the landed estate of Samuel and Mary Campbell, deceased, be divided equally (quantity and quality being regarded) between the eight heirs, including the complainants, and excluding the defendants, William and Samuel; and commissioners were appointed to make the division. On the 13th day of the same month, March, 1824, the commissioners made their report, allotting among the eight heirs, as directed, the whole tract of 1528 acres, except 420 acres, the aggregate of the two portions designated in the report as having been conveyed to William and Samuel, who were excluded from this division.

This report, to which no exception was ever filed, was confirmed by a decree of March, 1825, in which conveyances were directed, according to the report, and the cross bill against William and Samuel Campbell was dismissed. By the same decree, the personal estate and proceeds of the slaves were directed to be equally divided among all the heirs, and commissioners were directed to ascertain the amounts coming to each heir of Samuel and Mary Campbell, deceased, from the personal estate of both, and from the slaves, the proceeds of the sale of which were directed to be paid over to those entitled under the decree.

In September, 1825, the commissioner appointed for the purpose, reported separate deeds to all of the heirs except William and Samuel, (who, as the order says, have heretofore received deeds from their father,) and the deeds were approved and ordered to record. The orders from this decree of September, 1825, until February, 1832, were merely interlocutory, or making allowances to commissioners, to which there was no objection.

BANTON
*vs*
CAMPBELL'S H'S.
In February, 1832, a decree was rendered, which, re-- citing that the commissioners for dividing the land had made their report, and that the commissioners to sell the slaves and settle with the administrators, had also reported, proceeded to confirm their several reports, and directed the administrators and the commissioners who had sold the slaves, to pay over to the heirs the sums to which they were found entitled by said reports, the administrators reserving enough in their hands to pay the costs of this suit, and reasonable fees to the counsel employed.

The case referred to: (2 *Dana*, 421.)
In 1834, a writ of error was prosecuted by Banton and wife, for the reversal of the decrees of 1824, 1825 and 1832, and the defendants having pleaded that, as to all the decrees except the last, the writ was barred by lapse of time, the Court decided that it was barred, except as to the last decree, and refusing to enquire into the propriety of the distribution made according to the decree of 1825, and to which there was no exception, and which had been confirmed by the decree of 1832, this last decree (of 1832,) was reversed, because of the discretion given therein to the commissioners and the administrators, who were left to carry out the distribution, without further action of the Court; and the cause was remanded for proper proceedings to effectuate the decrees of 1824 and 1825: See *Banton and wife* vs *Campbell's Heirs*, (2 *Dana*, 421.)

The question now presented as to the right of the wife to prosecute a second writ of error to a decree, when herself and husband had been parties plaintiff, in his life time, for the same purpose.
What was done under this mandate does not appear; but now, in 1847, John Banton having died in July, his widow, E. Banton prosecutes a writ of error, issued in September, 1847, for the reversal of the decrees of 1823, 1824, 1825, 1826 and 1832, and the singular spectacle is exhibited of a widow's attempting, by writ of error, to reverse one decree which, on the previous joint writ of her husband and herself had already been reversed, and to reverse others, as to which it had been determined against her husband and herself, that the same writ was barred by the lapse of the statutory period for suing out writs of error.

The defendants in error did not, however, in the first instance, rely on the reversal of the decree of 1832, or

the judgment in bar of the joint writ as to the other decrees, but pleaded the statute of limitations, prescribing three years as the period within which writs of error must be sued out. The plaintiff replied, her coverture until within two years before the emanation of the writ, and the defendants having demurred to the replication, the whole record was submitted to the Court, as well for the determination of the question arising on the demurrer, as for a decision upon the merits, if the answer to the plea in bar should be deemed sufficient.

On the first hearing of the case, the Court being of opinion that there was no error in the partition of the land, affirmed the decree upon that subject, conceding that, as the decree of partition affected the wife's title to land, her right of suing out a writ of error for its reversal might be within the saving of the statute. But with respect to the other subjects of the joint suit and decree, viz: slaves and personalty, the Court, in consideration of the power of the husband over the subjects and over the decree, and of his interest in, and control over, the suit, and over the right of his wife, and in view of the great inconvenience to arise from disturbing such decrees of family settlement, after an indefinite lapse of time, which might extend to half a century or more, adopted the conclusion, that the wife's right of reversing such decrees by writ of error, should be regarded as joint only during the joint lives of husband and wife, and that when this joint right was extinguished during coverture, there was nothing for the saving of the statute to operate upon, after the death of the husband. And, although it was then supposed that there was an error to the prejudice of Banton and wife, and of other heirs, in giving to William and Samuel Campbell a full share of the slaves, considered as a separate fund for division, without bringing in the advancements which had been made to them in land, the writ of error as to the decrees affecting the slaves and personalty, was adjudged to have been barred by lapse of time.

A re-hearing of the case having been granted, on the petition of Mrs. Banton's counsel, filed after the delivery of the opinion of the Court, the defendants offered

a second plea in bar, relying on the former reversal of
the decree of 1832, on the joint writ of error of Ban-
ton and wife, and also on the former judgment in bar of
that writ, so far as it related to the previous decrees,
which judgment was founded on the plea of the statute
of limitations to the joint writ. Upon the objection
made to the filing of this plea, we are of opinion that,
when the first hearing was set aside, the cause, so far
as the right of pleading is concerned, stood as if it had
never been heard. There was nothing in the matter of
the plea which should have prevented its reception. On
the contrary, it presented a very grave, and certainly a
real question, with regard to the effect of the former
judgment barring the joint writ; and with respect to
the decree of 1832, the plea setting up the reversal of
that decree, in view of a change of opinion on the sav-
ing of the statute, may have been necessary to relieve
the case from the anomaly of two reversals of the same
decree, and for the same alleged errors; first, on the
writ of error of husband and wife, and then on the writ
of the wife, without any intermediate proceedings.

Upon the demurrer to this plea, we have no difficulty
in determining that, as to the decree of 1832, it pre-
sents, in the former reversal, sufficient matter to pre-
clude the plaintiff from prosecuting her present writ for
the reversal of that decree. If the mandate on the for-
mer reversal has not been executed, this may, and
should, still be done in the Circuit Court, under that
mandate. If error has occurred in the proceedings for
carrying it into effect, those proceedings should be
brought up for revision. We are satisfied that, upon
the fact of the former reversal being presented by plea,
the reversed decree cannot be considered as before this
Court for a second reversal. And, therefore, as to that
decree, the writ of error is adjudged to be barred.

With respect to the former judgment in bar of the
joint writ, so far as it sought the reversal of the decrees
prior to 1832, there is greater difficulty. It is certainly
true, in general, that a judgment in bar of a joint suit
by husband and wife in right of the latter, is as effectual
a bar to a future separate suit by the wife when she be-

When husband
and wife prose-
cute a writ of
error and reverse
a decree, no se-
cond writ of er-
ror lies in favor
of the wife after
the death of the
husband, to have
a second rever-
sal of the same
decree.

Where husband
and wife are bar-
red from prose-
cuting a joint
writ of error, by
limitation, and
it is so adjudged
against them,

comes discovert, as it would be to a future joint suit, or as any similar judgment is to a future suit by the same plaintiff for the same cause.   But here the judgment is not upon the merits, but merely applies and declares the statutory bar of three years to the joint writ sued out after the lapse of that period.   And if the statute intends, in all cases affecting personalty as well as realty, to save the right of the wife to prosecute her separate writ for two years after the death of her husband, though the statutory period for prosecuting the joint writ had expired long before his death, we do not clearly perceive that this right of the wife, thus saved from the effect of time during the coverture, should, or can be defeated, by the judicial ascertainment and application of the effect of a part of that time, declared in a judgment barring, on the ground of time alone, a joint writ prosecuted (of course by the husband,) when, under the statute, he had no right to prosecute it.   We are, therefore, inclined to the opinion that the question as to the effect of the former judgment in bar relied on in the second plea, is essentially the same as that presented by the demurrer to the replication to the first plea, and that if time alone does not bar the present writ under the saving of the statute, it is not barred by the judgment declaring that the joint writ which did not come within the saving, was barred by the statutory limitation applicable to it.

Under this view, we are thrown back upon the construction of the saving clause in the statute, or rather to the question of its application to decrees in favor of husband and wife in their joint suit, asserting rights of the wife which the husband might, by his separate act, receive, release or otherwise control; and whether, in such cases, a right remains in the wife, and is saved by the statute, to question such decrees as not sufficiently favorable, by writ of error, to be. sued out within two years after she becomes discovert, though the general limitation of three years may have expired during the coverture.   The great importance of the question, and a serious doubt as to the correctness of the conclusion first adopted induced the Court to grant a re-hearing;

BANTON
vs
CAMPBELL'S H'S.

can the wife, after the death of the husband, and within the time specified in the statute, prosecute such writ. *Quere.* Not decided.

BANTON
*vs*
CAMPBELL'S H'S.

and we are still not entirely satisfied upon the question. But as the whole case was submitted, as well upon the merits as they appear in the original suit, as upon the pleadings in bar of the writs of error, and as upon a more critical and deliberate examination of the record than we had an opportunity of making before the former decision, we are of opinion that the only error then supposed to have existed, does not in fact exist, and that there is no error available for a reversal of the decrees, even conceding the right to prosecute the writ, we do not deem it necessary definitively to decide either of the questions presented by the pleadings to the writ. But making a formal disposition of the demurrers, by deciding each in favor of the plaintiff, and thus sustaining the writ, except as to the writ of 1832, proceed very briefly to state our views upon the errors assigned, which are only available as they would have been, if assigned upon the joint writ of Banton and wife, presented in due time.

First, then, as to the land and slaves. It is alleged

Lands conveyed to husband and wife during coverture, survive to the wife upon the death of the husband, and descend to her heirs, and advancements made by husband and wife of such lands during the coverture, do not stand upon the same footing as if made by the husband of his estate, and cannot affect the right of the child or children so advanced in the slaves of the father.

in the bill, and is clearly deducible from the whole record, that the title to the land had been conveyed to Samuel Campbell, senior, and his wife jointly, but on the equity of the wife. Whence it follows, that the separate conveyance of Samuel Campbell did not pass the title, or any part of it, and that, upon his death, so much of it as had not been conveyed by both husband and wife, did not form any part of his estate, nor descend to his heirs, as such, but survived to Mrs. Campbell, who did not die for some year or two afterwards. It is also clearly deducible from the record, and, in fact, from the pleadings, that the slaves, which were the subject of the suit, had been the property of Samuel Campbell, and not of his widow. Then, so far, at least, as the land had not been conveyed by husband and wife during the coverture, not being a part of the same estate to which the slaves belonged, any advancements afterwards made by the owner of the land to the children of herself and husband, could not affect the interest of such children in the distribution of the slaves, unless by the terms of the advancement it was so provided. The

deeds to William and Samuel Campbell, junior, profess
to be made by the father and mother jointly, but the
first certificates of the clerk, dated in July and August,
1820, state the proof of each by two subscribing wit-
nesses as to both grantors, without any privy examina-
tion; or even acknowledgment by the wife. Upon these
certificates, the deeds were, of course, void as to the
wife, and as the deeds of the husband alone, they were
ineffectual. It appears, however, by further certifi-
cates of the clerk, that the same deeds, after having
been recorded on the first certificates, were again pro-
duced to him in his office, in July and August, 1821, and
acknowledged by Mrs. Campbell, one of the grantors,
to be her act and deed, the certificates being in the form
usual and appropriate in case of grantors who are not
*femes covert*, and containing no reference to a privy ex-
amination. The precise time at which Samuel Camp-
bell, the other grantor, died, does not appear, but it is
fairly to be inferred from the deposition of Anderson,
the brother of Mrs. Campbell, that she had not ac-
knowledged the deeds in the office, prior to her hus-
band's death, and that she acknowledged them after-
wards, in order to make the title of the grantees effec-
tual, which accords also with the inference from the
form of the certificates, implying that she was then not
a *feme covert*. Then, the deeds having been previously
void as to her, the re-production of them to the clerk,
when she was a *feme sole*, and her acknowledgment
made for the purpose of making them effectual, must be
taken as a re-delivery, which gave them effect as her
deeds from that date, and could not relate back, so as to
make them effectual from any period during the cover-
ture. The deeds convey an absolute fee simple, and
there is no sufficient proof of any condition, at any
time, and, indeed, no proof whatever of any condition
at the time of this acknowledgment and re-delivery,
which could affect this absolute title. Nor is there, in
our opinion, any evidence sufficient to establish an obli-
gation on the part of the grantees to claim no part of
the estates of their father and mother, or either of them,
until the other children should receive as much as would

equal the advancements thus made in land. The will of Mrs. Campbell, which disposes of all of the land except the two tracts which had been conveyed to Samuel and William, recognizes the conveyances to them, without referring to any such condition, but only imposes such condition, on the devise of seven acres to William, who renounces the benefit of it. Then, the two tracts conveyed to William and Samuel, were properly left out of the division of land and slaves; and there was no available error in dividing the residue of the land equally among the other heirs, without regard to the will of Mrs. Campbell devising portions of it specifically, because this was done by consent of all concerned, as stated in the record. And, moreover, it does not appear that Mrs. Banton would have received more land, if the will had been pursued, but the contrary is to be inferred, and may be assumed. And although a smaller number of acres was allotted to Banton and wife than the average quantity, yet as the commissioners were directed to make an equal division, regarding both quantity and quality, and they reported that they had done so, and the report was confirmed, without exception, the difference in quantity furnishes no presumption of inequality in value, and certainly no ground of reversal on this writ.

The sale of the slaves was prayed for by the complainants, and assented to by all other parties, and the division of the proceeds was precisely equal among all, charging against each advancements in slaves only; and no advancements had been made in land, except to William and Samuel, who, having received them from a different estate, were not bound to bring them into the partition of the slaves.

*Where the estate of husband and wife are each to be distributed, and the same persons are to share in the distribution, there is no necessity for keeping the funds separate, and having separate accounts and distributions.*

The same remarks apply substantially to the personalty. The report of the commissioners assigns to each distributee an equal sum, charging it only with advancements made to the same distributee in personalty. And all of these reports were confirmed, without exception.

It is true, that no discrimination is made in the reports or decrees between the estate of Samuel Camp-

bell, senior, and that of his wife. But the same persons were administrators of each estate; and the same persons entitled to the slaves and personalty. The land belonged to Mrs. Campbell's estate, the slaves to the husband's estate, and the personalty, in part, perhaps, to each. But no special necessity is shown for discrimination—none was asked for; the absence of it was not objected to in the Circuit Court; and no injury is shown to have accrued to the interest of Banton and wife, or of the wife alone, from its not having been made.

We have considered these various matters, as they appear upon this record, without reference to any question which might be made, by bringing up facts not now appearing. We think, on this writ of error, Mrs. Banton is bound by the record, as any other party would be, and by the admissions and acquiescence of her husband. And being of opinion, under this view, that there is no error, the decrees, except that of 1832, before disposed of, are *affirmed*.

*Turner* for plaintiff; *Caperton* for defendants.